USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/8/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

UNITED STATES OF AMERICA,

-*against*-

PAUL VAN MANEN,

       *Defendant.*

------------------------------------------------------------X

18 Cr. 30 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

Defendant Paul Van Manen moves: (1) to suppress evidence obtained pursuant to two New York State court-authorized wiretaps of his cellphone on the grounds that the wiretap applications failed to establish "necessity" as required by Title III of the Omnibus Crimes Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. § 2518 (1)(c); (2) for a court order directing the Government to provide contradictory, inconsistent or exculpatory statements of trial witnesses; and (3) for a court order directing the Government to disclose evidence it intends to introduce at trial pursuant to Federal Rule of Evidence ("FRE") 404(b).[1]

For the reasons that follow, Defendant's motion to suppress is DENIED. The Court declines to rule on Van Manen's remaining two motions at this time. If the Defendant's position is that Court intervention is still necessary as of now, he should brief the issue prior to the final pretrial conference scheduled for April 23, 2019 at 11:30 a.m.

## **BACKGROUND**

Van Manen is one of twelve defendants charged for alleged participation in a drug

---

[1] Van Manen also seeks leave to join in any motions filed by his co-defendants. Notice of Motion, Dkt. 121 ¶¶ 3, 8. Since none of Van Manen's co-defendants filed a motion in this action, this motion is moot.

trafficking organization (the "DTO") that distributed heroin laced with fentanyl in Staten Island, Brooklyn, and other locations from at least 2013 through January 2018. Indictment, Dkts. 1 & 60; Superseding Information (S3) Dkt. 91; Superseding Indictment (S4), Dkt. 108. Superseding Indictment S4 charges Van Manen with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. § 841(b)(1)(A), and a quantity of fentanyl, in violation of 21 U.S.C. § 841(b)(1)(C), the use of which resulted in the serious bodily injury of one individual and the death of another individual. Van Manen's alleged role in the conspiracy was that of a local distributor who sold approximately fifteen to twenty bundles of heroin he received from DTO leaders several times a week. Declaration of Peter Quijano ("Quijano Decl."), Dkt. 122 at 3. Ten of Van Manen's co-defendants have pled guilty and trial is scheduled for April 29, 2019.

The Law Enforcement Investigation

The Drug Enforcement Agency (DEA), the Department of Homeland Security (DHS), and the New York Police Department (NYPD) (collectively, "law enforcement investigators")[2] all took part in the investigation that ultimately resulted in the arrest of Van Manen and his alleged co-conspirators. Quijano Decl. at 2. Law enforcement investigators employed a variety of tactics to uncover the narcotics conspiracy, including confidential sources, undercover purchasers of narcotics, toll records, and cell-site and GPS geo-location data. *Id.* The Government also requested and was granted seven Title III wiretap authorizations, five authorized by the Southern District of

---

[2] In their opposition brief, the Government states that for a period of time, state and federal investigators were pursuing Van Manen and his co-conspirators simultaneously without knowledge of each other's investigations. Gov't Opp., Dkt. 131, at 9-10. According to the Government, Van Manen's motion, in failing to address this, erroneously attributes knowledge to the state investigators which they did not in fact have at the time they applied for the September 7, 2017 wiretap. *Id.* The Court finds the necessity requirement met even on the facts as laid out by Van Manen, and accordingly does not reach this issue.

2

New York and two authorized by the Appellate Division, Second Department of the State of New York. *Id.* at 3. The wiretaps challenged in this motion are the two granted by the Appellate Division, Second Department of the State of New York which authorized the interception of Van Manen's cell phone number 646.966.8865 (the "Wiretap Cell Phone") for a sixty-day period. *Id.* at 3-4. Each application was submitted with a supporting affidavit signed by Detective Arthur Truscelli, *see* Sept. 7 Truscelli Aff., Dkt. 131, Gov. Ex. A; Oct. 6 Truscelli Aff., Dkt. 131, Gov. Ex. B (collectively, the "Truscelli Affidavits"). Truscelli's October 6, 2017 Affidavit also incorporated all representations made in his September 7, 2017 Affidavit. *See* Oct. 6 Truscelli Aff. ¶ 14. Van Manen argues that the other investigative techniques were sufficient for law enforcement so that the state authorized wiretaps were not necessary—accordingly, all wiretaps associated with the September 7 and October 6 Affidavits must be suppressed.

Other Investigative Techniques

Before authorization was sought to wiretap Van Manen's Wiretap Cell Phone, law enforcement investigators had already uncovered incriminating information on Van Manen through other means. *Id.* at 5-10. Specifically, two confidential informants and one undercover police officer successfully arranged for and purchased heroin from Van Manen on four separate occasions, *id.* at 5-7, and through surveillance, law enforcement investigators witnessed Van Manen participate in two exchanges they believed to be narcotics transactions. *Id.* at 7-8. Law enforcement investigators also obtained phone records for Van Manen's co-defendant Anthony Francese, through which they learned that between August 15, 2017 and September 6, 2017, Francese placed or received calls from a number later attributed to Van Manen approximately 69 times, a pattern they determined was consistent with drug dealer communication. *Id.* at 8-9. A criminal background check also revealed that Van Manen had a least eight narcotics-related

3

convictions, the most recent of which was a November 2016 conviction for third-degree possession of a controlled substance with intent to sell. *Id.* at 9.

The State Wiretaps

By September 7, 2017, law enforcement investigators believed that Van Manen was part of a narcotics conspiracy and that he was using the Wiretap Cell Phone to further his drug trafficking business. *See* Sept. 7 Truscelli Aff. ¶ 50. Law enforcement investigators also concluded that intercepting the Wiretap Cell Phone was necessary to further their broader investigative goals, defined as:

> (a) the identification of all members of the narcotics organization, including co-conspirators, accomplices, agents, suppliers, deliverers, associates and customers who are involved in the purchase, sale, transfer, shipment, processing, packaging, delivery, importation, or possession of narcotic drugs, and the proceeds of such transactions; (b) the identification of any witnesses to the aforementioned crimes who would be in a position to give evidence against members of this organization; (c) the determination of all locations used by the members of this organization to store or distribute narcotics and to store or transfer proceeds from narcotics transactions; (d) the seizure of narcotics, dilutants, narcotics paraphernalia, narcotics records and the proceeds of narcotics crimes possessed or controlled by the members of this organization; and (e) the procurement of evidence necessary to prosecute successfully all members of this organization.

*Id.* ¶ 51; Oct. 6 Truscelli Aff. ¶ 40.

To support their representation of necessity, the Truscelli Affidavits provide a detailed explanation as to why the techniques employed to date could not achieve their investigative goals. *See* Sept. 7 Truscelli Aff. ¶¶ 52-81; Oct. 6 Truscelli Aff. ¶¶ 41-68. As for confidential informants and undercover officers, the Truscelli Affidavits explained that a confidential informant and an undercover officer working on this assignment had recently been "outed" in the press and that Van Manen was subsequently refusing to sell to individuals he did not know, making the attempted introduction of new confidential sources or undercover officers unlikely to succeed. Sept. 7 Truscelli Aff. ¶ 56. The Truscelli Affidavits also stated that Van Manen often engaged in counter-

4

surveillance measures to avoid exposing too much about the drug dealing operation to customers and that given his demonstrated caution, Van Manen was unlikely to provide information about his suppliers or stash locations to the remaining confidential informant, who was posing as a customer. *Id.* ¶¶ 54-55.

With respect to surveillance, the Truscelli Affidavits explained that law enforcement could not always follow Van Manen when he was driving because light traffic created a risk of detection, whereas heavy traffic made it hard for them to remain close to the Defendant's vehicle. *See* Sept. 7 Truscelli Aff. ¶¶ 58-67; Oct. 6 Truscelli Aff. ¶¶ 47-54. Surveillance also provided limited evidentiary value generally because while law enforcement could observe transactions such as Van Manen handing a bag to someone, without stopping him or the other person (and thereby potentially compromising the investigation), it was not possible to confirm whether narcotics or narcotics proceeds were in the bag. Sept. 7 Truscelli Aff. ¶¶ 59- 60. The Truscelli Affidavits also noted that law enforcement often did not have notice of significant meetings, and surveillance — unlike interceptions—would not provide much direct evidence of the significance of a meeting, *id.* ¶ 65, whereas interceptions would allow law enforcement to clarify their observations and seek search warrants and seize evidence. *Id.* ¶ 67. Law enforcement also could not get close enough to Van Manen and his associates to overhear conversations and, generally, surveillance would not provide them with details of all members of the organization and its suppliers. *Id.* ¶ 66.

With respect to phone records, the Truscelli Affidavits explained that such records do not confirm who is talking on the phone or what they are saying and noted that narcotics dealers often subscribe to phones in fake names, as Van Manen himself had done in this case. *See* Sept. 7 Truscelli Aff. ¶¶ 68-69; Oct. 6 Truscelli Aff. ¶¶ 55-56. As for search warrants, the Truscelli Affidavits explained that Van Manen did not have a steady residence and was instead moving

5

around between hotels, and that it was presently unknown where he and other members of the conspiracy stashed narcotics and narcotics proceeds. *See* Sept. 7 Truscelli Aff. ¶ 70; Oct. 6 Truscelli Aff. ¶ 57. Furthermore, even if a steady residence could be located, a search of the residence would likely alert others to the investigation. *See, e.g.*, Sept. 7 Truscelli Aff. ¶ 70.

As for the grand jury, the Truscelli Affidavits concluded that using the grand jury to seek testimony at this stage would be premature. Sept. 7 Truscelli Aff. ¶¶ 71-73; Oct. 6 Truscelli Aff. ¶¶ 58-60. Lower level members would not know about the whole operation and calling them as witnesses would alert other members of the DTO to the investigation. *See, e.g.*, Sept. 7 Truscelli Aff. ¶ 71. Additionally, the individuals already identified were likely to refuse to testify because they would incriminate themselves or would have to be immunized. *Id.* ¶ 72. Both immunization and approaching targets about potential cooperation, however, was risky because investigators did not yet have enough information to know if such individuals were being truthful, and there was a risk they would alert other targets. *Id.* ¶ 73.

With respect to the use of DMV, property, and utility record checks, the Truscelli Affidavits explained that investigators could sometimes identify individuals from these record checks, but that they did not provide any information on the identity and location of additional associates or stash houses. *See* Sept. 7 Truscelli Aff. ¶¶ 74-75; Oct. 6 Truscelli Aff. ¶¶ 61-62. They further noted that narcotics traffickers often use fictitious names and addresses when renting locations used in narcotics trafficking. *See, e.g.*, Sept. 7 Truscelli Aff. ¶ 75.

As for social media checks, the Truscelli Affidavits explained that a search warrant had been obtained on Van Manen's Facebook account, but since then, he had not posted anything publicly about narcotics dealings. *See* Sept. 7 Truscelli Aff. ¶¶ 76-77; Oct. 6 Truscelli Aff. ¶¶ 63-64. Nor did the public social media accounts of other identified individuals provide probable cause

6

to believe they were using such accounts in furtherance of narcotics trafficking. Sept. 7 Truscelli Aff. ¶ 77. Furthermore, the information obtained pursuant to the May 2017 search warrant showed that Van Manen was cautious about giving out even his phone number on social media, making it unlikely that he would use social media to have explicit conversations about narcotics trafficking even if additional search warrants were obtained. *Id.* ¶ 25.

Finally, the Truscelli Affidavits noted that many participants in the narcotics conspiracy likely did not have daily contact with each other, so the investigation's objectives could only be met by interceptions of multiple conversations. *Id.* ¶ 86.

Judicial Authorization

Associate Justice Colleen D. Duffy of New York's Appellate Division, Second Department approved the first wiretap order authorizing the interception of Van Manen's Wiretap Cell Phone on September 7, 2017 (the "September 7, 2017 Order"). Quijano Decl. at 3. The second, which extended the authorization for an additional thirty days, was granted by Associate Justice Linda Christopher of New York's Appellate Division, Second Department on October 6, 2017 (the "October 6, 2017 Order"). *Id* at 4.

## DISCUSSION

I.  **The Title III Wiretaps**

    A. **Legal Standard**

        i. **Federal Law Controls**

Where a defendant is charged in federal court with a federal crime, federal law controls admissibility regardless of whether the evidence in question was originally obtained by state or federal actors. *United States v. Morrison*, 153 F.3d 34, 57 (2d Cir. 1998). It is well-settled that this principle applies in the context of adjudicating suppression motions in federal courts. *See, e.g.*,

*Preston v. United States*, 376 U.S. 364, 366 (1964); *Elkins v. United States*, 364 U.S. 206, 224 (1960); *see also United States v. Rowell*, 903 F.2d 899, 901 (2d Cir. 1990).

### ii. The Necessity Requirement

Under Title III, the federal statute governing wiretaps, a court cannot authorize a wiretap unless it finds that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c)). To establish this condition met, a wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This requirement, known as Title III's "necessity requirement," "is designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Serrano*, 450 F. Supp.2d 227, 236 (S.D.N.Y.2006) (quoting *United States v. Kahn*, 415 U.S. 143, 153 n. 12 (1974)).

The necessity requirement, however, is not "an insurmountable hurdle and only requires that the Government demonstrate that normal investigative techniques would prove difficult." *United States v. Labate*, 2001 WL 533714, at *13 (S.D.N.Y. May 18, 2001) (internal quotations omitted). While "generalized and conclusory statements that other investigative procedures would prove unsuccessful" are not sufficient, "the Government is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance." *United States v. Concepcion*, 579 F.3d 214, 218 (2d Cir.2009) (quotations omitted); *United States v. Marroquin-Corzo*, 2012 WL 3245473, at *4 (S.D.N.Y. Aug. 7, 2012). Instead, Title III "only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *Concepcion*, 579 F.3d at 218

8

(quoting *United States v. Diaz*, 176 F.3d 52, 111 (2d Cir.1999)). Even where "a normal investigative technique is theoretically possible, it does not follow that it is likely. What [Title III] envisions is that the showing be tested in a practical and commonsense fashion." *Concepcion*, 579 F.3d at 218 (quoting S. Rep. No. 90–1097 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2190).

### iii. Presumption of Validity

"Wiretap orders are presumed valid," *United States v. Zapata*, 164 F.3d 620 (2d Cir. 1998), and "a defendant seeking to suppress an authorized wiretap 'bears a significant burden.'" *United States v. Sang Bin Lee*, No. 13 CR. 461 JMF, 2014 WL 144642, at *3 (S.D.N.Y. Jan. 15, 2014) (quoting *United States v. Rodriguez-Perez*, 2012 WL 3578721, at *6 (S.D.N.Y. Aug. 16, 2012)). Because wiretaps require judicial authorization in the first instance, "[w]hen considering a motion to suppress, the authorizing judge's determination is entitled to substantial deference, and the sufficiency of the application is to be 'tested in a practical and commonsense fashion.'" *Labate*, 2001 WL 533714 at *13 (citing *United States v. Torres*, 901 F.2d 205, 231 (2d Cir. 1990); *see also United States v. Bellomo*, 954 F.Supp. 630, 639 (S.D.N.Y.1997) (quoting *United States v. Fury*, 554 F.2d 522, 530 (2d Cir. 1977)).

## B. Analysis

Van Manen challenges the September 7, 2017 Order and the October 6, 2017 Order on two grounds. First, he contends that the Truscelli Affidavits do not satisfy Title III because they provide only "boilerplate, conclusory assertions that each available alternative investigative technique had been tried and failed," Def. Mem., Dkt. 124 at 13, which courts routinely reject. *See, e.g., Concepcion*, 579 F.3d 214, 218 (2d Cir. 2009). Second, he argues that the wiretaps fail regardless because the facts of this case "clearly demonstrate[] that alternative investigative techniques were successful and likely to have had continued success." Def. Mem. at 13.

Van Manen's characterization of the Truscelli Affidavits' statement of necessity as "boilerplate" and "conclusory" is plainly contradicted by the record. The Truscelli Affidavits collectively dedicate twenty-three pages of detailed explanation as to why each alternative investigative technique utilized to date, including undercover and confidential informants, surveillance, phone records, DMV, property, and utility record checks, search warrants, and social media checks, had proven inadequate to achieve the investigative goal of identifying "all members of the narcotics organization," and gathering the evidence needed for their successful prosecution. *See* Sept. 7 Truscelli Aff. ¶¶ 52-81; Oct. 6 Truscelli Aff. ¶¶ 41-68. These statements are not only lengthy, but also case-specific, detailing why in Van Manen's specific circumstance, his demonstrated efforts to evade detection, coupled with the recent outing of a confidential informant and undercover cop by the press, made electronic interception necessary. *Id.* Unlike in *United States v. Lilla*, 699 F.2d 99 (2d Cir. 1983), a case relied on by Van Manen where the supporting affidavit "merely asserted that 'no other investigative method exists to determine the identity' of individuals who might have been involved," *Serrano*, 450 F. Supp. 2d at 239, the necessity statements included in the Truscelli Affidavits were comprehensive; they unequivocally satisfied Title III.

Van Manen's second argument, that the wiretaps were not necessary because traditional investigative techniques were in fact succeeding, is equally unsupported by the facts of this case. The conspiracy being investigated here involved multiple overdose deaths, a variety of dealers, customers, and potential suppliers, and transactions in locations across New York City, including Staten Island and Brooklyn. Quijano Decl. at 2. While the record shows that by September 7, 2017, law enforcement investigators likely had sufficient evidence to implicate Van Manen alone with four sales of heroin, the goal of the investigation, and even the charges eventually brought

against Van Manen, were much broader. As described in the Truscelli Affidavits, law enforcement investigators were seeking to identify all members of the narcotics conspiracy; identify any witnesses to the crimes; determine all locations used by the organization to store or distribute narcotics or narcotics proceeds; seize narcotics and narcotics proceeds; and procure evidence necessary to prosecute all members of the organization. Sept. 7 Truscelli Aff. ¶ 51; Oct. 6 Truscelli Aff. ¶ 40. The Truscelli Affidavits clearly lay out why, notwithstanding evidence that Van Manen had sold heroin on four occasions, this goal had not been met, and was unlikely to be met, absent the use of a wiretap.[3]

Moreover, Van Manen's position, that any investigative success precludes the subsequent use of a wiretap, is unsupported by the law in this Circuit. Title III does not require that investigators achieve no success whatsoever before applying for a wiretap. *United States v. Shulaya*, No. 17-CR-0350 (KBF), 2017 WL 6513690, at *7 (S.D.N.Y. Dec. 20, 2017) ("It need not be the case that other techniques have yielded *no results*."); *Labate*, 2001 WL 533714, at *15 ("Certainly the Government's efforts were directed not only to uncover and monitor the alleged criminal activity, but to be able to prosecute the offenders with convincing and competent evidence."). Instead, Title III requires only that investigators show that traditional techniques would not "suffice to expose the crime." *Kahn*, 415 U.S. at 153 n.12 (1974). Consistent with that guidance, courts in this Circuit routinely uphold wiretap authorizations sought after significant investigation. *See, e.g., United States v. Young*, 822 F.2d 1234, 1237 (2d Cir. 1987) (approving wiretap because surveillance would have been impractical and telephone toll records would not

---

[3] *See United States v. Jackson*, 345 F.3d 638, 644 (8th Cir. 2003) ("[Where] conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator, the necessity requirement is satisfied."); *see also United States v. Feola*, 651 F. Supp. 1068, 1105 (S.D.N.Y. 1987) ("clandestine nature of conspiracies makes them less susceptible to normal investigative techniques") (internal quotation omitted).

have uncovered target's partners in crime); *Sang Bin Lee*, 2014 WL 144642, at *5 (denying motion to suppress wiretap based on necessity grounds where "the Affidavit made clear that wiretapping was far from the first step in the investigation").

Finally, from a criminal justice policy perspective, Van Manen's argument is illogical. Van Manen is essentially advocating for a system whereby the criminal defendant, already charged with a crime and made aware of the evidence against him, can then look back at the phases of the investigation which led to his arrest and determine the point at which the evidence was sufficient for his successful prosecution, and then became excessive. Surely, that cannot be the standard. Such a reading would render the wiretap a useless tool, as evidence obtained from a wiretap application supported by probable cause could never withstand judicial scrutiny. That is clearly not the purpose of Title III's necessity requirement and is bad public policy.

In sum, the September 7, 2017 Order and October 6, 2017 Order challenged by Van Manen clearly satisfied Title III's necessity requirement and suppression is not warranted.[4] Van Manen's motion to suppress interceptions obtained as a result of these two wiretaps is DENIED.

## II. Witness Statements

Defendant also requests the Government disclose witness statements obtained during the investigation that are inconsistent with, or contradictory to: (1) "prior statements made by that individual"; (2) "the statements of others interviewed"; and (3) "the Government's theory of prosecution in its case against Van Manen." Quijano Decl. at 21. Defendant's first two requests constitute material the Government's required to produce pursuant to *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) and the Jencks Act, 18 U.S.C. § 3500. Defendant's

---

[4] The Government also argues that even if the necessity requirement is not satisfied here, the good faith exception applies. *See United States v. Leon*, 468 U.S. 897, 922 (1984). Since the Court finds Title III's necessity requirement satisfied for both challenged wiretaps, it does not reach this issue.

12

third request is for exculpatory materials pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The Government argues that Van Manen's *Giglio* and Jencks Act request is premature because this material must only be produced "in time for its effective use at trial," *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001), which courts in this Circuit have held satisfied with productions as late as several days before trial. *See, e.g., United States v. Green*, 2004 WL 2985361, at *3 (S.D.N.Y. Dec. 23, 2004); *United States v. Canter*, 338 F. Supp. 2d 460, 462 (S.D.N.Y. 2004); *United States v. Trippe*, 171 F. Supp. 2d 230, 238 (S.D.N.Y. 2001). As for Defendant's *Brady* request, the Government responds that it is "aware of its obligations under *Brady* and its progeny," and "[s]hould the Government become aware of *Brady* material, it will produce it in a timely manner." Gov. Opp. at 131.

Trial in this matter is scheduled for April 29, 2019, and this motion was filed on November 29, 2018. The Court will hold a final pretrial conference on April 23, 2019 at which time the Court will decide any questions still open regarding these requests by Van Manen.

### III. Rule 404(b) Material

Van Manen also requests that the Government disclose any crime, wrong, or other act which the Government seeks to introduce against him at trial pursuant to FRE 404(b). Quijano Decl. at 21. Rule 404(b) requires the Government to provide this notice either reasonably in advance of trial, or during trial if the court excuses pretrial notice on good cause shown. Fed. R. Evid. 404(b)(2). The Government states it will produce this material, but that Defendant's request here again is premature. *See United States v. Valenti*, 60 F.3d 941, 945 (2d Cir. 1995); *United States v. Triana-Mateus*, No. 98 Cr. 958 (SWK), 2002 WL 562649, at *6 (S.D.N.Y. Apr. 15, 2002). The Court will also reserve judgment on this motion until the final pretrial conference.

13

## CONCLUSION

For the above stated reasons, Defendant's motion to suppress is DENIED. As for Van Manen's motions for: (1) *Brady, Giglio* and Jencks Act material; and (2) FRE 404(b) disclosures, the Court reserves judgment on these two motions until the final pretrial conference scheduled for **Tuesday, April 23, 2019 at 11:30 a.m.** If Van Manen still seeks Court intervention regarding these requests, he is to brief the issues prior to final pretrial conference.

The parties are further advised that consistent with the Court's Individual Practices, the Proposed Voir Dire, Proposed Request to Charge and fully briefed motions *in limine* are due three business days before the final pretrial conference.

Dated: New York, New York
April 8, 2019

SO ORDERED

*[signature]*

PAUL A. CROTTY
United States District Judge